LARRY FOX, JACKIE NOE,
PAUL ALBRIGHT, NANCY
STANTON, VICTOR POULSEN,
ANNE WOSHLO, MARIE
CLEMENTE,

    Plaintiffs,

            CASE NO. 93-CV-74615-JAC-PJK
            JUDGE JULIAN ABELE COOK
            MAGISTRATE JUDGE PAUL J. KOMIVES

 v.

MASSEY-FERGUSON, INC.,

    Defendant.

_____/

**OPINION AND ORDER DENYING TRW'S MOTION FOR MAGISTRATE APPROVAL
OF CHANGE IN ADMINISTRATOR UNDER SETTLEMENT AGREEMENTS (Doc.
Ent. 301) and DEEMING MOOT MOTION TO ENFORCE SETTLEMENT
AGREEMENT (Doc. Ent. 302)**

## I.  BACKGROUND

   This case was filed on October 29, 2003.  *Fox, et al. v. Massey Ferguson Inc. et al.*, Case

No. 93-cv-74615-JAC-PJK.  On April 15, 1998, Lucas Varity and the Class Representatives

entered into a settlement agreement.  Doc. Ent. 302-3.  The agreement defines "administrator" as

"John Hancock (Unicare) or any entity properly designated pursuant to Section 15

["Administrator and Other Service Providers."] ***to provide administrative services for the***

***medical plan under contract with Lucas Varity***[,]" Doc. Ent. 302-3 ¶ 1.1 (emphasis added); the

1990 Racine Plan as "the Health Care Benefits currently provided by Lucas Varity to Post-April

13, 1987 Racine Class Members which consists of those benefits described in the 1990 Racine

Insurance Agreement as modified by the 1991 Settlement[,]" Doc. Ent. 302-3 ¶ 1.9;[1] duration of coverage as "coverage under the Plan for all eligible Class Members (including eligible Dependents) as follows: . . . Groups 3, 4, 5, 9, 10 and 11 - for the Surviving Spouse and eligible Dependents for the life of the Surviving Spouse[,]" Doc. Ent. 302-3 ¶ 1.14; health care benefits as "the medical/surgical, prescription drug, dental, vision and hearing aid benefits provided by Lucas Varity to Class Members, including payment of any or all of a Class Member's or his or her dependent spouse's Medicare Part B premium[,]" Doc. Ent. 302-3 ¶ 1.18; the Modified 1990 Racine Plan as "the Health Care Benefits Plan Lucas Varity shall provide to Pre-April 13, 1987 Class Members beginning on January 1, 2000, which consists of the 1990 Racine Plan as modified by this Settlement Agreement[,]" Doc. Ent. 302-3 ¶ 1.32; other service providers as "the administrators or providers of the prescription drug, dental, vision and hearing aid plans[,]" Doc. Ent. 302-3 ¶ 1.34; the retiree committee as "a committee of Class Members who monitor the administration of the Plans and the Settlement Agreement after the Distribution Date[,]" Doc. Ent. 302-3 ¶ 1.39;[2] and 1991 Settlement as "the Settlement Agreement and Release between Massey-Ferguson, Inc. and the UAW, dated February, 1991, a copy of which is attached as

---

[1]The retiree committee points out that 1990 Racine Insurance Agreement provides with respect to "insurance benefits for pensioners," that:

> Effective with the first day of the month following the month in which a pensioner or dependent who is eligible for health benefits under 9.05 becomes eligible for hospital, surgical and medical benefits, under the Federal Social Security Act, such benefits shall be coordinated with the health benefits plan provided by the company with the company considered secondary carrier.

Doc. Ent. 302-4 at 39 (§ 9.05 Health Benefits); Doc. Ent. 302 at 6, 12.

[2]Initially, the Retiree Committee was "comprised of Larry Fox, Edgar Dansby, Earl Johnston, Victor Poulsen, Norbert Przybylowicz, Paul Albright, and Patricia Flanagan[,]" Doc. Ent. 302-3 ¶ 1.39.

Exhibit J[,]" Doc. Ent. 302-3 ¶ 1.44.

With respect to eligibility and participation, the agreement notes that "[a]ll eligible Living Class Members shall be Participants in the applicable Plan." Doc. Ent. 302-3 ¶ 9.1. It further provides that "[t]he individuals listed on Exhibit B still living on the Effective Date will be Participants in the 1980 Detroit Plan for Pre-April 13, 1987 Class Members. Individuals listed on Exhibit C still living on the Effective Date will be Participants in the 1990 Racine Plan for Post-April 13, 1987 Racine Class Members." Doc. Ent. 302-3 ¶ 9.2. With respect to continuation of the 1990 Racine Plan for Post-April 13, 1987 Racine Class Members, the agreement provides that "Lucas Varity will provide the 1990 Racine Plan for Post-April 13, 1987 Racine Class Members, unchanged by the terms of this Settlement Agreement, for the Duration of Coverage set forth in Section 1.14." Doc. Ent. 302-3 ¶ 10.1. Continuation of the 1980 Detroit Plan for Pre-April 13, 1987 Class Members and Implementation of the Modified 1990 Racine Plan are described in ¶ 11. Doc. Ent. 302-3.

The agreement also provides that "[a]ny controversy or dispute arising out of or relating to the following matters shall be resolved by the Magistrate:[3] . . . disputes concerning changes in the Administrator or Other Providers under Section 15[.]" Doc. Ent. 302-3 ¶ 18.1(c). "In the event that the Retiree Committee and Lucas Varity are unable to resolve a dispute for which a right to submit the matter to the Magistrate has been provided in this Settlement Agreement, that dispute will be presented to the Magistrate who will not have the authority to modify or amend this Settlement Agreement, but only to apply the Settlement Agreement, as written, to particular

_____

[3]This opinion and order assumes the agreement is referring to a "United States magistrate judge[,]" as referred to in the Historical and Statutory Note of 28 U.S.C. § 631 ("Change of Name") and Section 321 of Pub.L. 101-650.

factual situations. The Magistrate will consult with the parties and will make a final and binding decision after such formal or informal hearing as the Magistrate deems appropriate." Doc. Ent. 302-3 ¶ 18.4.

A miscellaneous provision of the agreement provides that "[t]his Settlement Agreement ma be amended or modified only by a written instrument signed by the Class Representatives and Lucas Varity. Any such amendment that would materially affect the level of Plan benefits shall be effective only if approved by the Court." Doc. Ent. 302-3 ¶ 23.2.

On June 30, 1998, Judge Tarnow, acting for Judge Cook, entered final judgment and order of dismissal. Doc. Ent. 279.

## II. TRW SEEKS TO INSTITUTE HUMANA AS THE ADMINISTRATOR OF MEDICAL CARE BENEFITS

At the time the settlement agreement became effective, Unicare was the administrator of medical benefits. Doc. Ent. 301 at 16; Doc. Ent. 302-3 ¶ 15.2. Effective January 1, 2005, "TRW changed the Administrator of medical benefits . . . from Unicare to Meritain (formerly North American Health Plan)." Doc. Ent. 301 at 17. *See also* Doc. Ent. 302 at 15.

On September 5, 2006, the Colby Retiree Committee met with Kiwicz, TRW's Vice President of Compensation and Benefits; Rastigue; Iocobelli; and Humana representatives. Doc. Ent. 302 at 7; Doc. Ent. 301-3. As TRW explained in an October 18, 2006, letter to retiree committee members, TRW sought to change the medical benefits administrator to Humana, Inc. According to TRW, "[t]his change in Administrators is being made in order to take advantage of an innovative approach to plan administration that simplifies the coordination of medical benefits between Medicare and the applicable Health Care Benefits Plan." The letter explained that "[t]here will be no reductions in covered benefits or available level of service under the

Health Care Benefits Plan[,]" "[n]o longer will it be necessary to have multiple filings and coordination of benefits between Medicare Parts A and B and the Health Care Benefits Plan[,]" and "ALL MEDICAL CLAIMS WILL GO DIRECTLY TO ONE ADMINISTRATOR, HUMANA, FOR PROCESSING." Doc. Ent. 302-6. *See also* Doc. Ent. 301-7.

On October 20, 2006, class counsel indicated to defense counsel that "we would consider permitting TRW to offer the Humana plan as an alternative plan as long as it was voluntary and as long as Class Members could easily return to the indemnity plan." Doc. Ent. 302-7. It was class counsel's position that "TRW intends to substitute a new plan of benefits - one that provides benefits now provided by Medicare as well as those provided by the Current Plan." Doc. Ent. 302-7. Class counsel's December 8, 2006, letter to defense counsel served as "the Retiree Committee's disapproval of that proposed action under Section 14.4 and a notice of dispute under Section 17.2." Also, class counsel wished to reserve the right to challenge the implementation of the Humana plan as violating the settlement agreement's terms. Doc. Ent. 302-8. *See also* Doc. Ent. 301-8.

On December 22, 2006, TRW wrote to retiree committee members, in part explaining that "class members remain in Medicare". As TRW stated, "Medicare Advantage plans cover all services covered by Medicare and members continue to have Medicare rights and protections." The letter further addressed the permanency of medicare advantage plans; provider acceptance of Humana; and enrollment requirements. Doc. Ent. 302-9. *See also* Doc. Ent. 301-9.

On January 25, 2007, class counsel wrote to TRW, "as notice under Section 17.3 of the Settlement Agreement that the Retiree Committee hereby demands that the Humana PFFS dispute be submitted to the Magistrate." Doc. Ent. 302-10. *See also* Doc. Ent. 301-10.

5

## III.    CONGRESSIONAL DISCUSSION OF MEDICARE ADVANTAGE PRIVATE FEE-FOR-SERVICE PLANS

The retiree committee has provided the Court with some documentation of discussion on Medicare Advantage PFFS plans.  To begin, it supplies the March 2007 report, "An Examination of Medicare Private Fee-for-Service Plans," prepared by Avalere Health LLC for the Henry J. Kaiser Family Foundation.  Doc. Ent. 302-17.  The report examines PFFS Medicare plans; an overview of PFFS plans; market and enrollment trends; payment; and considerations for Medicare beneficiaries.  Doc. Ent. 302-17.  Also, the retiree committee offers the May 8, 2007, Kaiser Daily Health Policy Report titled, "Private Medicare Advantage Fee-for-Service Plans Under Scrutiny Because of Marketing Practices[.]" Doc. Ent. 302-21.

The retiree committee also brings to the Court's attention the May 22, 2007, statements of several individuals to the Ways & Means Subcommittee on Health, United States House of Representatives.  Abby L. Block, Director of Center for Beneficiary Choices CMS, addressed enrollment in PFFS plans; additional benefits for PFFS enrollees; issues raised about PFFS plans and CMS oversight of PFFS plans.  Doc. Ent. 302-11.  David Lipschutz of California Health Advocates addressed factors contributing to marketing abuses; marketing misconduct; experiences of PFFS enrollees; and dual eligibles and PFFS plans.  Doc. Ent. 302-12.  Hospital Administrator Brock Slabach, on behalf of the National Rural Health Association, addressed "the potential downside of Medicare Advantage in rural communities[.]" Doc. Ent. 302-13.  Mark E. Miller, Ph.D, Executive Director of the Medicare Payment Advisory Commission (MedPAC), addressed PFFS plans in Medicare Advantage (MA).  Among the topics he addressed were the enrollment growth, payment levels, and the efficiency of PFFS plans; MA benchmarks and plan payments; the effect of floor payment rates on MA benchmarks; MA benchmarks and plan

payments: PFFS versus other plans; the history of PFFS plans and how they differ from other MA plans; and advantages enjoyed by PFFS plans compared to other plans. Doc. Ent. 302-14. Patricia Neuman, Sc.D, Vice President and Director of the Medicare Policy Project (The Henry J. Kaiser Family Foundation), discussed the focus on Medicare PFFS plans; the current Medicare PFFS landscape; characteristics of beneficiaries in PFFS plans; and key considerations for beneficiaries. Doc. Ent. 302-15. Sean Dilweg, State of Wisconsin Commissioner of Insurance, discussed marketing complaints; limited state regulatory authority; and financial incentives. Doc. Ent. 302-16.

Additionally, the retiree committee refers to the June 15, 2007, CMS press release "Plans Suspend PFFS Marketing", stating that "in response to concerns about marketing practices, seven health care sponsors have signed an agreement to suspend voluntarily the marketing of [PFFS] plans." Doc. Ent. 302-20. It also refers to the June 18, 2007, press release of representative Pete Stark, Chairman of the Ways and Means Health Subcommittee, which responded to CMS's announcement that "seven private health insurance companies had agreed to a voluntary and temporary suspension of [PFFS] marketing." Doc. Ent. 302-22.[4]

## IV.     PENDING MOTIONS BASED UPON THE SETTLEMENT AGREEMENT

---

[4]The retiree committee also provides the November 15, 2006, article, "Side effects to Medicare Advantage; Some seniors enroll in plan, only to find out later it's not accepted by their doctor[,]" from *The Charlotte Observer*; the April 29, 2007, article, "Universal In Limbo Over PFFS Plan[,]" from *The Tampa Tribune*; the May 8, 2007, article, "Politics & Economics: Medicare's Growing Pains - - - Alternative Plan's Sales Tactics, Subsidies Draw Ire[,]" from *The Wall Street Journal*; and the June 27, 2007, article, "Many Advantage Providers Violated Rules, Medicare Says[,]" from *The Tampa Tribune*. Doc. Ent. 302-18.
Additionally, it provides the May 28, 2007, *Modern Healthcare* article, "Docs vs. insurers", which discusses how the American Medical Association "spars with AHIP [America's Health Insurance Plans] over Medicare Advantage". Doc. Ent. 302-19.

On April 5, 2007, Massey-Ferguson filed a motion to enforce settlement agreement by referral to magistrate. Doc. Ent. 297. On April 10, 2007, Judge Cook referred this motion to me for hearing and determination. Doc. Ent. 298. A hearing on this motion was noticed for May 30, 2007. Doc. Ent. 299. However, on May 17, 2007, I entered an order granting the motion, setting deadlines and cancelling the hearing. Doc Ent. 300.

Currently before the Court is TRW's June 29, 2007, motion for magistrate approval of change in administrator under settlement agreements. Doc. Ent. 301. By its motion, TRW seeks "to change the medical benefits administrator for Medicare-eligible Class Members from Meritain Health Inc. ('Meritain') to Humana Inc. ('Humana')." Doc. Ent. 301 at 11.

Also before the Court is the July 1, 2007, motion by the retiree committee to enforce settlement agreement. Doc. Ent. 302. The retiree committee requests that the Court "reject TRW's request to make the Humana advantage PFFS Plan mandatory for all Class Members." Alternatively, the retiree committee "requests that this Court permit limited discovery and schedule an evidentiary hearing so that [it may] present evidence on the nature of the Humana Advantage PFFS Plan." Doc. Ent. 302 at 20.

On July 19, 2007, Judge Cook referred these motions to me for hearing and determination. Doc. Ent. 303. On August 1, 2007, I entered a stipulation and order extending the deadline for response briefs to August 6, 2007. Doc. Ent. 304.

On August 4, 2007, the retiree committees filed a response to TRW's motion to impose the Humana Advantage PFFS Plan on class members. Doc. Ent. 305. On August 6, 2007, TRW filed a response brief in support of its motion for magistrate approval of change in administrator under settlement agreements. Doc. Ent. 306.

On August 17, 2007, TRW filed a reply brief in support of its motion for magistrate approval of change in administrator under settlement agreements.  Doc. Ent. 307.  On August 31, 2007, the retiree committee filed a reply in support of its motion in which it renews the arguments made in its August 4, 2007, response.  Doc. Ent. 308.

**V.    IS TRW'S PROPOSED CHANGE IN THE THIRD-PARTY PAYOR OF MEDICAL CLAIMS FROM MERITAIN HEALTH TO HUMANA INC. A CHANGE IN "ADMINISTRATOR" UNDER SECTION 15?**

**A.**    With respect to administrator and other service providers, the settlement agreement provides that "[f]ollowing the Effective Date, Lucas Varity and the Retire Committee will work cooperatively to ensure that the Plans are administered in a fair, professional and efficient manner in recognition of the legitimate interests of Lucas Varity and the Class Members."  Doc. Ent. 302-3 ¶ 15.1.  "On the Effective Date, the Administrator of the medical plan will be John Hancock (Unicare) who will provide third party administrative services under contract with Lucas Varity."  Doc. Ent. 302-3 ¶ 15.2.

It further provides:

> If Lucas Varity desires to change any Administrator or any Other Service Provider, it will send each of the members of the Retiree Committee a notice of the proposed change and a brief explanation of the reasons for the proposed change.  Upon request, Lucas Varity will promptly provide the Retiree Committee with any information reasonably necessary to evaluate the proposed change and the qualifications of the proposed successor administrator or provider. By no later than 60 calendar days after notice by Lucas Varity of a proposed change in any administrator or provider, the Retiree Committee will approve or disapprove such proposed change.  If there is a dispute between Lucas Varity, and the Retiree Committee regarding a proposed change in any administrator or provider, it shall be resolved in accordance with the provisions of Section 18 ["Dispute Resolution by The Magistrate"].

Doc. Ent. 301-5 ¶ 15.4.

**B.**    According to "Medicare & You 2007," "[m]ost people get their Medicare health care

coverage in one of two ways[:]" (1) original Medicare plan or (2) Medicare Advantage Plans like HMOs and PPOs. Doc. Ent. 301-16 at 4. "Medicare Advantage Plans are health plan options that are approved by Medicare and run by private companies. ***They are part of the Medicare Program, and sometimes called 'Part C.'  When you join a Medicare Advantage Plan, you are still in Medicare***." Doc. Ent. 301-16 at 5 (emphasis added). They "provide all of your Part A (hospital) and Part B (medical) coverage and must cover medically-necessary services." "Medicare pays an amount of money for your care every month to these private health plans, whether or not you use services."

Among the Medicare Advantage Plans are Medicare Private Fee-for-Service (PFFS) Plans. Doc. Ent. 301-16 at 5. In most cases, health care can be received from any doctor or hospital. The patient "can go to any Medicare-approved doctor or hospital that accepts the plan's payment terms for covered services." Specifically, the brochure provides:

> PFFS plans are different from the Original Medicare Plan. PFFS plans are offered by private companies. The private company, rather than Medicare, decides how much it will pay and what you pay for the services you get. Extra benefits are often offered for an extra premium.

Doc. Ent. 301-16. Also, the Medicare Private Fee-for-Service Plan Marketing Rules dated August 28, 2007, acknowledge that "***Medicare PFFS Plans are not the same and the Original Medicare Plan or Medigap (Medicare Supplement Insurance) policies.***" Doc. Ent. 308-2 at 3 (emphasis added).

**C.** TRW admits that it "may not reduce or eliminate the level of health care benefits agreed to by the parties in the Agreements and has not attempted to do so[;]" however, it contends that "the Agreements do not mandate how TRW is to administer the health care benefits promised to Class Members, other than that they must be "administered in a fair, professional and efficient

manner in recognition of the legitimate interests of [TRW] and the Class Members." Doc. Ent. 301 at 15. *See also* Doc. Ent. 302-3 ¶ 15.1.

As previously noted, TRW seeks "to change the medical benefits Administrator for the Medicare-eligible Class Members . . . from Meritain to Humana." Doc. Ent. 301 at 18. With respect to the Humana Medicare Advantage Program Designed for the Class Members, TRW states that "[t]he Medicare Advantage arrangement proposed for the Class Members is Humana's Group Medicare Private Fee-For-Service ("PFFS") program." Doc. Ent. 301 at 21. TRW represents that "Humana would serve as a single point of contact and process all medical claims on behalf of both Medicare and TRW[,]" and "[t]here would be no reductions in covered benefits or available level of service for the Class Members under the PFFS program." Doc. Ent. 301 at 21-22. Additionally, TRW represents that "Humana's PFFS Program is not a network-based system[,]" noting that "Class Members would be able to use any provider they wished under the Humana PFFS program[,]" and "if a particular provider chooses not to accept payment from Humana <u>or</u> Medicare, the Class Member would pay the claim directly and be reimbursed by Humana." Doc. Ent. 301 at 23-24.

TRW argues that "[t]he change to Humana would be a change in administrator under the settlement agreements." Doc. Ent. 301 at 27-31. TRW argues that its proposal is not a change in health care plans, because "health care plans" "are defined solely with reference to the types of 'Health Care Benefits' covered[,]" and "none of these benefits would be modified (other than some enhancements)[.]" Doc. Ent. 301 at 27. In support of this argument, it contends that (1) "Unicare and Meritain have provided, and Humana will provide, third party administrative services common to ERISA plans[;]" (2) "[c]ompanies operating Medicare Advantage Programs

11

provide administrative services for CMS [Centers for Medicare & Medicaid Services[5]], for federally-mandated benefits[;]" and (3) "[a]s the unified claims payor, contracting with TRW, Humana takes the place of Meritain and CMS, and fits the definition of administrator under each of the settlement agreements."  Doc. Ent. 301 at 28-31.

In support of the second argument, TRW cites *First Medical Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 52 (1st Cir. 2007) ("The legislative history of [42 U.S.C. § 1395w-26(b)(3)] clarified that 'the [Medicare Advantage Program] is a federal program operated under Federal rules and that State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency.'") (quoting H. Conf. Rep. 108-391 at 557, reprinted in 2003 U.S.C.C.A.N. at 1926) and *PacifiCare of Arizona, Inc. v. Surgical Assistant Associates, L.L.C.*, No. CV06-00132-PHX-NVW, 2007 WL 708833, *1 (D. Ariz. Mar. 2, 2007) ("Part C providers are obligated to comply with Medicare's regulatory scheme in administering the federal benefits.").  Doc. Ent. 301 at 29.

Attached to the motion is the June 28, 2007, affidavit of Edward Sandrick, Humana's Director of Group Medicare.  Sandrick alleges that "Humana undergoes a rigorous and ongoing certification process with CMS" "[t]o ensure ongoing compliance with CMS requirements in offering Medicare Advantage[.]" Doc. Ent. 301-14.

**D.**    The retiree committee's own motion makes three arguments which are relevant here. Doc. Ent. 225 at 18-19.  First, the retiree committee argues that "Class Members will be denied treatment and subject to liability for the full cost of care[.]" Doc. Ent. 302 at 18.  In support of this argument, the retiree committee contends that "[p]hysicians are not required to accept

---

[5]*See* www.cms.hhs.gov.

12

payments from Medicare Advantage PFFS plans and can refuse to treat patients covered by such plans." Doc. Ent. 302 at 18 (citing Block (Doc. Ent. 302-11)).[6]

Second, the retiree committee argues that "TRW cannot be permitted to shift its obligation under the settlement agreement to taxpayers and Medicare recipients[.]" Doc. Ent. 302 at 18-19. Third, the retiree committee argues that "[t]he uncertainty as to the viability of Medicare Advantage PFFS Plans creates unjustifiable risks for Class Members[.]" Doc. Ent. 302 at 19.

**E.** In response to the retiree committee's motion, TRW contends that (A) "TRW's designation of Humana as the unified claims payor will be a change in administrator under the agreements[,]" (B) "[t]he change offers the same or better benefits and a fair, professional, and efficient administration, recognizing the legitimate interests of both TRW and the class members[,]" and (C) "TRW will submit to monitoring of its change in administrators." Doc. Ent. 306.

**F.** This order assumes that the parties dispute not the interpretive question of what "plan" means, but, rather, the factual question of whether the proposed change would constitute a change in benefits or level of service. With this in mind, I look to the "TRW Retiree Group Plans" chart, which compares benefits under the "Humana Proposal Custom Plan 65" with benefits under the post April 13, 1987, and pre April 13, 1987, modified plans. Many of the

---

[6]Citing the May 22, 2007, statement of Abby L. Block on Medicare Advantage Private Fee-For-Service Plans before the Ways & Means Subcommittee on Health (Doc. Ent. 302-11) and the March 2007 "An Examination of Medicare Private Fee-for-Service Plans" report (Doc. Ent. 302-17), the retiree committee argues that "[w]hile a provider who treats a PFFS plan participant is deemed to have accepted the PFFS payment, the provider can refuse to provide services to an enrollee at each visit." Doc. Ent. 302 at 10.

proposed plan's benefits are the same. Some are more favorable - for example, private duty nursing and routine exams are covered at 80% while neither are covered under the modified plans. However, there is at least one disadvantage - dialysis is covered at 80% with limitations, while it is covered under the modified plans at the same percentage without limitation. Doc. Ent. 301-12.

Perhaps there are other differences. Suffice it to say that, in the absence of an argument by TRW that the settlement agreement permits this change notwithstanding a difference in coverage, I can only conclude that this is a change in benefits or level of service.

## VI.   IF IT IS A CHANGE IN ADMINISTRATOR (IN OTHER WORDS, IF IT IS NOT A CHANGE IN PLAN), DOES SECTION 14 OF THE SETTLEMENT AGREEMENT PROHIBIT THE PROPOSED CHANGE?

**A.**   With respect to HMO and Medicare Risk HMO Optional Coverage, the settlement agreement provides:

> Lucas Varity will *offer* Medicare Risk or other HMO alternatives to the hospital/surgical/prescription drug coverage provided to Class Members under this Settlement Agreement where available and where Lucas Varity's cost to provide the HMO coverage (including in Lucas Varity's cost to provide the HMO coverage, administrative costs and the cost of Medicare Part B premium over and above $13.50 paid by Lucas Varity pursuant to Section 9.3 above for any individuals who select HMO coverage) is at least 10% less than its cost (including administrative costs) of providing the hospital/surgical/prescription drug coverage under this Settlement Agreement.

Doc. Ent. 302-3 ¶ 14.1 (emphasis added). "Lucas Varity will reimburse those Class Members who participate in HMO *optional* coverage *offered* by Lucas Varity the full Medicare Part B premium. For those Class Members participating in HMO *optional* coverage who receive $13.50 or other payment toward their Medicare Part B premium as part of their Massey-Ferguson pension, Lucas Varity will pay them the difference between the $13.50 or other

14

payment they receive as part of their Massey-Ferguson pension and the monthly Medicare Part B premium." Doc. Ent. 302-3 ¶ 14.3 (emphasis added). "Any HMO will be NCQA accredited." Doc. Ent. 302-3 ¶ 14.4.

"Lucas Varity may terminate *offering* any HMO if it no longer can achieve the 10% or more savings in costs described in Section 14.1 above. If Lucas Varity terminates an HMO because it is no longer achieving the requisite savings in costs, and the Retiree Committee challenges that decision in writing within 30 days of notice from Lucas Varity, the dispute will be referred to the Impartial Account for a final and binding determination. Lucas Varity will not terminate the HMO coverage until the Impartial Accountant issues his or her decision that termination is in accordance with the terms of this Settlement Agreement, provided such decision is issued within sixty (60) days of the date of the Retiree Committee's written challenge." Doc. Ent. 302-3 ¶ 14.5 (emphasis added). "If the Retiree Committee claims that appropriate HMO coverage is available and Lucas Varity disagrees, the Impartial Accountant will resolve disputes as to whether HMO alternatives are available within the requisite cost savings requirements of Section 14.1. That determination will prevail until Lucas Varity can demonstrate th the requisite savings cannot be achieved, pursuant to Section 14.5. Doc. Ent. 302-3 ¶ 14.6. "Lucas Varity and the Retire Committee will share equally the costs and feeds of the Impartial Accountant. If it is determined that the HMO continues to achieve requisite savings under 14.5 or that appropriate HMO coverage is available under 14.6, Lucas Varity will be responsible for the costs and fees of the Impartial Accountant." Doc. Ent. 302-3 ¶ 14.7. "Participants in the HMO and HMO Medicare Risk *optional* coverage can opt out of that coverage and back into the applicable Plan upon 30 days notice." Doc. Ent. 302-3 ¶ 14.8

(emphasis added).

**B.**     The retiree committee argues that "[t]he settlement agreement prohibits mandatory participation in Medicare Alternative Plans such as Humana PFFS[.]" Doc. Ent. 302 at 11-17. The retiree committee concludes by stating that "[i]f TRW wants to offer a Medicare risk optional health care plan to Class Members, it must be offered as an option to the contractual Plans - as contemplated by Congress and the Settlement Agreement - and with the agreement of the Class Representatives - as required by the Settlement Agreement." Doc. Ent. 302 at 17.

**C.**     The retiree committee's response to TRW's motion to impose the Humana Advantage PFFS plan on class members and its reply in support of its motion to enforce settlement agreement present the argument that "[f]orced enrollment in the Humana PFFS Plan would violate the settlement agreements[.]" Doc. Ent. 305 at 5-10, Doc. Ent. 308 at 2-3. In conclusion, it states that "[t]he parties to these Settlement Agreements carefully negotiated the terms under which TRW could offer Medicare alternate plans to Class Members as an option to the contractual benefit Plans." Doc. Ent. 305 at 10.

**D.**     In a reply in support of TRW's motion, it argues that "[t]he committees ignore the issue of the administrator as defined by the agreements, wrongly contending the change is equal to an HMO under the agreements." Doc. Ent. 307 at 5. TRW states that "the Committees ignore th[e] fact that a PFFS plan is exactly what they have presently, and that this PFFS form of coverage and payment will continue. The Committees also ignore the fact that TRW is not changing the 'plan' it committed to provide in the Settlement Agreements." Doc. Ent. 307 at 5.

**E.**     Resolution of this issue turns upon the parties' definition of "Medicare Risk or other HMO alternatives[.]" Doc. Ent. 302-3 ¶ 14.1. Even if, as TRW contends, the proposed change

is not equal to an HMO, Doc. Ent. 307 at 5, there is still the question of whether the proposed change is equivalent to a "Medicare Risk" program. It appears that TRW would argue that the phrase "Medicare Risk or other HMO alternatives[,]" should be construed to mean the entire universe of HMO programs.

On the other hand, the retiree committee is arguing that the proposed change is a "Medicare Risk" alternative. According to the aforementioned report, "An Examination of Medicare Private Fee-for-Service Plans," "PFFS plans are operated by private health plan sponsors that contract with CMS on an at-risk, capitation payment basis while paying providers on a fee-for-service basis." Doc. Ent. 302-17 at 5. Relying upon this report, the retiree committee contends, "[t]here is no question that Medicare alternative PFFS plans are 'risk' plans." Doc. Ent. 302 at 12. The retiree committee contends that PFFS Plans "are a more recent variation of Medicare Risk alternatives to traditional Medicare," and "they mirror Medicare's basic fee for service model[.]" Doc. Ent. 302 at 13.

However, in light of my conclusion that the proposed change is a change in benefits or level of service, the retiree committee's motion is rendered moot and I need not resolve the question of whether the proposed change is prohibited by Section 14 of the settlement agreement.

## VII. WOULD FORCED ENROLLMENT IN THE HUMANA PFFS PLAN VIOLATE 42 U.S.C. § 1395w-21?

**A.** The retiree committee's response to TRW's motion to impose the Humana Advantage PFFS plan on class members and its reply in support of its motion to enforce settlement agreement present the argument that "[f]orced enrollment in the Humana PFFS Plan would violate federal law[.]" Doc. Ent. 305 at 10-13, Doc. Ent. 308 at 4-5. The retiree committee

17

contends that "[e]ach and every Medicare eligible retiree has the absolute, federally guaranteed right to remain in the original Medicare. And, TRW has the absolute, contractual obligation to provide benefits supplemental to the Original Medicare for those individuals who exercise that right." Doc. Ent. 305 at 12.

TRW argues that "[t]he change to Humana as the administrator will be done lawfully and under CMS procedures specifically authorized for employer-sponsored group plans." Doc. Ent. 307 at 5-8. In support of this argument, TRW states that (1) "[t]he statute allows CMS to establish processes for elections, and permits 'deemed' elections, election by default, and passive elections[,]" and (2) "[e]mployers may enroll retirees that are in a group plan into Medicare Advantage without the retirees affirmatively opting-in." Doc. Ent. 307 at 5-6, 6-8.

The retiree committees explain that they "are not referring to convenience[.]" Rather, they "are talking about their contractual and statutory rights to stay in (the Original) Medicare and not be required to transfer (against their will) into a Medicare alternative plan which, as CMS states, is 'not the same . . . .'[.]" Doc. Ent. 308 at 4.

**B.**    42 U.S.C. § 1395w-21 concerns eligibility, election and enrollment with regard to Medicare+Choice plans.[7]  "[E]ach Medicare+Choice eligible individual (as defined in paragraph (3)) *is entitled to elect to receive benefits* (other than qualified prescription drug benefits) under this title--

> (A) through the original medicare fee-for-service program under parts A and B of this subchapter, or

---

[7]According to the retiree committee, "[i]n 2003, Congress substituted the terms 'Medicare Advantage' or 'MA' for 'Medicare+Choice.' The terms are interchangeable." Doc. Ent. 305 at 10 n.10.

(B) through enrollment in a Medicare+Choice plan under this part,

and may elect qualified prescription drug coverage in accordance with section 1395w-101 of this

section."  42 U.S.C. § 1395w-21(a)(1) (emphasis added).

The process for exercising choice in a Medicare+Choice Program "shall permit an

individual who wishes to elect a Medicare+Choice plan offered by a Medicare+Choice

organization to make such election through the filing of an appropriate election form with the

organization."  42 U.S.C. § 1395w-21(c)(2)(A).

"The term 'Medicare+Choice private fee-for-service plan' means a Medicare+Choice

plan that–

> (A) reimburses hospitals, physicians, and other providers at a rate determined by
> the plan on a fee-for-service basis without placing the provider at financial risk;
>
> (B) does not vary such rates for such a provider based on utilization relating to
> such provider; and
>
> (C) does not restrict the selection of providers among those who are lawfully
> authorized to provide the covered services and agree to accept the terms and
> conditions of payment established by the plan.

42 U.S.C. § 1395w-28(b)(2).

**C.**     The retiree committee argues that 42 U.S.C. § 1395w-21(c)(2)(A) "alone is sufficient to

dispel any illusion TRW (and Humana) have tried to instill in the Retiree Committees and this

Court that TRW and Humana singly or together have the right to 'enroll' Class Members in the

Humana PFFS plan by fiat.  Such an action would violate the Social Security Act which ensures

that individuals, not employers or Medicare Advantage organizations, determine whether they

want to receive their benefits from the 'original medicare' or from a Medicare Advantage plan

provider."  Doc. Ent. 305 at 10-11.

I note that the September 5, 2006, Humana Medicare Advantage presentation states, with respect to the enrollment process, that "[r]etirees and dependents are required to complete an Enrollment Application." Doc. Ent. 302-5. I also note that The Marketing Rules provide that Medicare PFFS Plans MUST: . . . "[c]all you after you enroll to make sure that you wanted to join and that you understand how the plan works[.]" Doc. Ent. 308-2 at 3.

I further note that the Medicare Managed Care Manual, Chapter 2 - Medicare Advantage Enrollment and Disenrollment, has been filed with the Court. Doc. Ent. 305-2. *See also* 307-3. It contains provisions on alternate employer group election mechanism (20.4.1); passive elections (20.4.2); group enrollment for employer or union sponsored plans (20.4.8) and group enrollment for employer or union sponsored plans (40.1.8). Doc. Ent. 305-2 at 2, 4. A summary of the September 8, 2006, updates notes an "[a]dded group enrollment process for employer/union sponsored plans as announced in 10/5/06 memo[.]" Doc. Ent. 307-4 at 4 (40.1.8). The April 13, 2007 summary of updates states in part that "MAOs are responsible for ensuring that group enrollment process meets MA enrollment requirements and that arrangements with employers/unions make such requirements clear[.]" Doc. Ent. 307-6 at 4-5 (40.1.8). The June 20, 2007, update notes group enrollment for employer or union sponsored plans (20.4.3) and group enrollment for employer/union sponsored plans (40.1.7). Doc. Ent. 307-5.

However, in light of my previous conclusion that the proposed change is a difference in benefits or level of service, I need not reach a conclusion on the retiree committee's argument that forced enrollment in the proposed plan would violate 42 U.S.C. § 1395w-21.

## VIII.   IS THE RETIREE COMMITTEE UNJUSTIFIED IN DISAPPROVING OF TRW'S PROPOSED CHANGE IN ADMINISTRATOR WHEN THE CHANGE

**WILL PROVIDE THE SAME OR BETTER LEVEL OF BENEFITS, AND WILL PROVIDE A FAIR, PROFESSIONAL, AND EFFICIENT ADMINISTRATION, RECOGNIZING THE LEGITIMATE INTERESTS OF BOTH TRW AND THE CLASS MEMBERS?**

According to TRW, "[t]he settlement agreements contemplate retiree disapproval only for good reason associated with the level or administration of benefits." Doc. Ent. 301 at 26-27. TRW argues that "[t]he retiree committees do not have good reason to disapprove of this change in administrator." In support of this argument, TRW contends that (1) "[t]he change would not reduce the level of benefits[;]" (2) "[t]he change would not jeopardize the fair, professional, and efficient administration of benefits[;]" and (3) "[t]he change in administrator recognizes the legitimate interests of both TRW and the Class Members." Doc. Ent. 301 at 31-35.

The retiree committee contends that "[e]ven if TRW's intended action did not violate the Social Security Act and the Settlement Agreements, Class Members covered by the Settlement Agreements here should not be made involuntary pawns in this continuing, volatile debate." Doc. Ent. 305 at 13.

As was the case in the previous section, in light of my previous conclusion that the proposed change is a difference in benefits or level of service, I need not reach a conclusion on TRW's argument that "[t]he retiree committees do not have good reason to disapprove of this change in administrator." Doc. Ent. 224 at 31-35.

**IX.  ORDER**

In accordance with the foregoing, TRW's June 29, 2007, motion for magistrate approval of change in administrator under settlement agreements (Doc. Ent. 301) is DENIED. The July 1, 2007, motion to enforce settlement agreements (Doc. Ent. 302) is DEEMED MOOT.

IT IS SO ORDERED.

The attention of the parties is drawn to Fed. R. Civ. P. 72(a), which provides a period of ten (10) days from the date of service of this Order within which to file any written appeal to the District Judge as may be permissible under 28 U.S.C. 636(b)(1).


s/Paul J. Komives

Dated: 3/31/08                    PAUL J. KOMIVES
                                  UNITED STATES MAGISTRATE JUDGE


The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on March 31, 2008.

s/Eddrey Butts
Case Manager